LAKE v. MEACHAM et al.

---

## LAKE VS. MEACHAM and others.

| 13 | 355 |
|----|-----|
| 75 | 426 |
| 13 | 355 |
| 92 | 248 |
| 13 | 355 |
| 93 | 67 |

Written agreements will not be reformed on the ground of mistake, except upon the most clear and positive proof that such mistake was actually committed in reducing them to writing. The mistake must be made entirely plain by proofs which are entirely satisfactory.

APPEAL from the Circuit Court for *Walworth* County.

Action commenced in September, 1857, to reform a contract secured by mortgage, and to foreclose the mortgage. The facts alleged in the complaint are as follows: On the 16th of April, 1855, the plaintiff conveyed a farm to Edgar Meacham for $6,000, one-third of which was paid with other land, and the residue was to be secured by mortgage, and was to bear interest payable annually. The condition of the mortgage actually executed by Meacham was for the pay-

January Term, 1861.

LAKE
v.
MEACHAM et al.

ment of $4,000 " and interest, at the time specified in, and according to the conditions of, a certain note or contract " bearing even date therewith, and executed by the said Edgar Meacham. The note or contract referred to was as follows : " For value received I promise to pay *Robert A. Lake,* or bearer, four thousand dollars, as follows : one thousand dollars on the first day of May, 1856 ; two thousand in four equal annual payments of five hundred dollars each thereafter, and one thousand dollars on the first day of May, 1861 ; provided that if Jesse Meacham and his present wife, of, &c., shall be living then, the time of payment shall be extended until one of them shall have died, on the last payment of one thousand dollars ; and provided further, that in case there shall, at the time any of the payments become due, be any arrearages on the annuity or semi-annual payment due the said Jesse Meacham and secured by a mortgage on the premises this day deeded by said *Lake* to said [Edgar] Meacham, then the payments due *on this note shall be extended* until such arrearages are paid. April 16, 1855. EDGAR MEACHAM." The attorney who drew the papers inadvertently omitted the words " with interest, payable annually," in drawing said contract. The mortgagor died before the 1st of May, 1856, when the first installment fell due. The note was given and received under the impression that it provided for the payment of interest annually, and the omission was not discovered by the plaintiff until about the 1st of January, 1857.

The administrators of the mortgagor answered by a denial of any knowledge or information sufficient to form a belief, as to any of the matters stated in the complaint. The heirs, who were infants, made the same answer, by their guardian *ad litem.* On the trial, A. O. Babcock, the attorney who drew the mortgage and contract, testified : " I think the parties had agreed upon their bargain before they called upon me to write the papers. I recollect that at the time of the drawing of the papers the contract was read over, and Edgar Meacham objected to a portion of it that provided for the payment of the annuity to Jesse Meacham, as not being explicit enough ; the contract therefore was redrawn, and I

think that in redrawing it, the words " with interest " were
omitted, my attention being drawn to the annuity. The
contract and mortgage, as originally drawn, were drawn to-
gether, and my impression is that they both provided for
the payment of interest. I have not the contract as first
drawn, and cannot state positively. When the contract and
mortgage, as originally drawn, were first read over, there
were no objections made to it by either party, on the ground
that it provided for the payment of interest. There was no
difference of opinion between them nor any discussion had
before me in regard to the subject of interest. If they had
stated to me, when they requested me to draw the papers,
that the contract was not to draw interest, I think it would
have made an impression on my mind; because I never draw
papers on the sale of real estate, to run any length of time,
without their providing for the drawing of interest, and the
nature of this contract is such—its running so long—that it
would have been an unusual thing not to draw interest. I
think I should recollect it, if it had been not to draw inter-
est. Independently of the papers, I have no recollection of
the terms of the contract, but from the mortgage and the cir-
cumstances, I have no doubt that the words 'with interest'
were left out of the contract through mistake. At the time
the contract was read over, the mortgage was also read over.
It was either read over by myself or by Mr. Meacham. My
impression is that I drew the deed and handed it to Mr.
Meacham to examine and to read it over to *Mr. Lake*, and
while they were reading that, I drew the mortgage and con-
tract, and then read them to them. While I was reading
the contract, Mr. Meacham read over the mortgage himself.
The deed and contract were executed at my office. My
impression is they were delivered at the time they were
signed. They may have been retained by the parties and
delivered afterwards. I do not recollect in regard to it. I
have no recollection of the parties giving me any instruc-
tions in regard to interest. I had the first contract be-
fore me when I drew the second, and intended the second to
conform to the first, except in regard to the annuity, but
whether I referred to it in drawing I cannot say. If the con-

tract had been shown to me lately without the mortgage, I don't know that I should have had any doubt that it was drawn according to the agreement of the parties as stated to me. *Mr. Lake* came after me to go up and draw the papers. When the contract was stated to me, which was after I went up, both parties were present. What I mean by their stating the contract to me is, that they gave me instructions for drawing the papers. I have no recollection of any conversation in regard to the agreement, at all. I have no recollection of their giving me any instructions in regard to interest. Aside from the papers, I have no recollection in regard to the contract as first drawn, any farther than my supposition is that it corresponded with the mortgage."

Henry Lake, a son of the plaintiff, testified that he heard some conversation between the plaintiff and Edgar Meacham about the bargain for the land a few days before the papers were drawn; that his father's eyes were poor, and the witness was in the habit at that time of assisting him in his business; that his father might have been able to read writing, but witness thought he generally got some one to read it for him; that his father urged Meacham to make the payments faster than the latter proposed, and the latter remarked that times might change; that the payments, together with the interest, speaking of the yearly payments at whatever time they were to be paid, would come to a certain sum (the amount witness did not recollect) yearly, or at the time the payments were to be made, and would be about as much as he thought he could safely raise or pay. On cross-examination, he said that he never heard the parties say anything on the subject of interest at any other time than that of the conversation above stated; that his impression was that at the time Mr. Babcock drew the papers he heard the terms stated to Babcock about the same as they were stated by Edgar in that conversation; and that he first heard that the contract did not provide for interest, through a letter from home in the winter of 1856–7. As to the delivery of the papers, the witness stated that he thought the papers were not exchanged by the parties for several days after they were drawn, and he was quite positive that he

was not present with the parties at any time after the papers were drawn, at Edgar Meacham's house, to look over them.

George Hibbard testified that in February, 1856, he went with Edgar Meacham to the house of the plaintiff, to solicit a subscription of railroad stock. Mrs. Lake opposed it, saying, among other things, that their expenses were heavy, and that their children were calling upon them for aid. Mr. Meacham replied that he was paying them more interest than would cover their expenses for their children. This was all witness heard upon that subject. Mr. Meacham did not state upon what demand he was paying interest.

Henry Carpenter, a son-in-law of the plaintiff, testified that he worked for Edgar Meacham three or four days in the harvest of 1855; that on one of those days Meacham said he had a good deal of interest to pay Mr. Lake on the place, and that he had a plenty of time to pay it in, and so he thought he should see through it, or something to that effect. On cross-examination, witness said that he thought one Oscar Jones was present at the conversation.

Thomas Lake, also a son of the plaintiff, testified that he had two conversations with Edgar Meacham, one three or four weeks before he bought the farm of the plaintiff, and the other in the summer afterwards. In the first, Meacham said he had not yet traded with the plaintiff, because the plaintiff wanted more interest than he could afford to pay; that he had offered him seven per cent., and the plaintiff thought he ought to have a little more, and he thought the seven per cent. was enough, paying the price he did. In the other conversation, Mr. Meacham said he should not have bought the farm but for its lying right by his house, and he thought he could afford to pay for it; he had a good long pay day, and was only paying seven per cent. for the money.

On the part of the defendants, Oscar Jones testified that he thought it was in 1854 that Henry Carpenter worked in the harvest for Meacham; that the witness worked for Meacham pretty much all the time in the harvest of 1855; that he did not see Henry Carpenter there, and thought he could not have been there three or four days without the

witness knowing it.   A nephew of Edgar Meacham testified that he worked for said Edgar all the summer of 1855, and was positive that Henry Carpenter did not work there in harvest time that summer.   One witness testified that the reputation of Thomas Lake for truth and veracity was bad, and that of Henry Carpenter was about like that of the generality of people.   The witness stated, on cross-examination, that he had not lived in the same neighborhood with Thomas Lake for three years past, and knew nothing about him during that time.   Another witness introduced by the defendants, said that he was acquainted with Thomas Lake's character for truth and veracity up to the time he left the neighborhood, three years before, and had never heard it questioned.   The same witness testified that the character of Henry Carpenter for truth was not good, and that the character of Henry Lake for truth in 1851 or 2 was bad, but that he afterwards redeemed his character so far that when he left the neighborhood, many citizens signed a paper testifying that they had full confidence in him.   The recommendation was not for a general but a particular purpose.   The witness thought that Jesse Meacham signed the recommendation.

It was proved that the administrators of Meacham rented the farm to *Lake* for the year ending May 1, 1858, for $300, and the year before, it had been rented to him for a little less.   One witness was asked whether any person of ordinary prudence would have entered into the contract which it was alleged Meacham entered into in regard to the farm, including interest on the sum to be paid, and answered that, in his opinion, neither Meacham nor any other man could afford to pay the price he was to pay, and interest upon it.   Two witnesses, Louisa Whitney and Lucy Mallory, testified that the plaintiff and his son Henry came to Edgar Meacham a few days after Mr. Babcock drew the papers in reference to the sale of the farm; that they sat down at the table and read over some papers; the papers were not read aloud, but looked like a deed and some smaller papers, and the witnesses understood from the conversation that they were the papers relating to that sale; that they remained in conversa-

January Term,
1861.

Lake
v.
Meacham et al.

tion and reading over the papers about an hour, at the close of which Mr. Meacham asked the plaintiff if they were all right. The plaintiff said, "Yes, I think they are;" and Henry Lake said, "Yes, I don't see anything but what they are." The witnesses did not notice that *Lake* brought any papers there; one of the witnesses thought Meacham took them out of his bureau.

The circuit court found that in drawing the note, the words "with interest" were omitted by mistake, and that the note should be reformed by inserting those words; and decreed a foreclosure and sale for the amount due on the note as reformed.

*Wyman Spooner*, for appellants:

A court of equity will reform a written contract by rectifying a mistake or supplying an omission, only on the most clear and positive evidence that a mistake has been committed in reducing the contract to writing. Story's Eq. Jur., chap. 5, §§ 152–157, and note; Adams' Eq., 343 (marg.), and note; *Souverbye vs. Arden*, 1 Johns. Ch., 252, and authorities cited; 1 Ves., 317; 3 Bro., 451; 6 Ves., 333, 334; *Ex'r of Getman vs. Beardsley*, 2 Johns. Ch., 274; *King vs. Baldwin*, id., 554; *Gillespie vs. Moore*, id., 585, and authorities cited in those cases; *Dutton vs. Waterman*, 6 Wis., 265; *Newton vs. Holley*, id., 592; *Marks vs. Pell*, 1 Johns. Ch., 598; 6 id., 211. 2. A court of equity will not exercise its power to rectify a mistake by reforming a written contract, unless it be guided by clear and positive evidence as to the terms of the contract as mutually agreed to by the parties. Cases above cited, and *Lyman vs. United Ins. Co.*, 2 Johns. Ch., 630; *Blanchard vs. McDougal*, 6 Wis., 167; *Parkhurst vs. Van Cortlandt*, 1 Johns. Ch., 273. The court will not make contracts for the parties, nor be controlled by the weight of testimony merely for the purpose of reforming such contracts. 6 Wis., and 2 Story's Eq. Jur., *supra*.

*Cary & Pratt*, for respondent, argued that the nature of the case was such, that a mistake is fairly implied from the circumstances, (1 Story's Eq. Jur., § 162,) the sale being of a productive farm, chiefly on credit, the last installment not falling due under six years, and after that time its payment

January Term,
1861.

LAKE
v.
MEACHAM et al. being suspended until the death of Jesse Meacham, or of his wife.   2.  We have the mortgage as originally drawn, which provided for the payment of interest, and the testimony of Babcock as to the correspondence between the mortgage and the note as first drawn, in respect to interest; and for the purposes of this case, the mortgage is in the nature of a *prior* writing, and is evidence of what the note, when re-drawn, should have been.  1 Story's Eq. Jur., § 160; *Waterman vs. Dutton*, 6 Wis., 265.  [The arguments on both sides as to the force of the parol evidence, is omitted.]

January 15.       *By the Court*, DIXON, C. J.   There is no more undeniably sound, wholesome and well founded rule of evidence in proceedings in equity, than that written agreements will not be varied or reformed on the ground of mistake or fraud, except upon the most clear and positive proof that mistake or fraud in reducing them to writing was in fact committed. Upon this subject Judge STORY says: " In such cases, if the mistake is clearly made out, by proofs entirely satisfactory, equity will reform the contract, so as to make it conformable to the precise intent of the parties.  But if the proofs are doubtful and unsatisfactory, and the mistake is not made entirely plain, equity will withhold relief, upon the ground that the written paper ought to be treated as a full and correct expression of the intent, until the contrary is established beyond reasonable controversy."  1 Story's Eq. Jur., § 152.  In the case of *Newton vs. Holley*, 6 Wis., 604, the language of this court is to the same effect.  It is there said that the writings between the parties must be taken to contain the real contract until the contrary is established beyond reasonable doubt.  The danger of setting aside or varying the solemn engagements of parties deliberately reduced to writing, by the introduction of parol evidence substituting other material terms and conditions, is so obvious as to put the correctness of this rule beyond controversy.  Courts cannot interfere with such contracts when any part of the foundation for the relief rests upon conjecture or mere probability of fact, but the whole must be cleared of all reasonable doubt, and be sustained by solid and convincing testimony.

In the words of Judge STORY, the mistake must be made
entirely plain by proofs which are entirely satisfactory. Ap-
plying this rule to the present case, I do not see how the
judgment of the circuit court can be sustained. If I were to
decide it upon probabilities of fact raised by the evidence,
then I might say that I think it is probable that a mistake
occurred. But in deciding it upon the ground that I am
well and clearly convinced from the parol proofs, as against
the presumption of correctness which the law attaches to the
instrument itself, I must say that my conclusion is very dif-
ferent. I am not so convinced of the existence of a mistake.
On the other hand, there are many facts and circumstances
which, to my mind, tend strongly to show that it is possible,
if not to some extent probable, that there was no mistake
about it. Of these are those deposed to by Louisa Whitney
and Lucy Mallory, the two last witnesses examined on the
part of the appellants, regarding the manner in which the
papers were exchanged, the examinations which they re-
ceived, the time which was occupied for that purpose, and
the mutual expressions of the parties that they were satisfied
of their correctness. To these may be added the proofs of
the actual value of the lands, and of the annual profits aris-
ing therefrom, the fairness of the price paid without the ad-
dition of interest, and the length of time which elapsed be-
fore the discovery of the alleged mistake. It seems to me
that it must be admitted that these, and other like circum-
stances with which the transaction was surrounded, would,
in case the mistake had otherwise been clearly proved, have
had some tendency to raise a doubt upon the matter. But
the chief difficulty with the case is, that there is nowhere to
be found any clear, positive and satisfactory evidence that
the parties ever made any bargain whatever concerning the
alleged interest. The complaint alleges that the mistake
occurred by the omission by the conveyancer to insert the
words "with interest, payable annually," according to the
bargain and direction of the parties. No proof was offered
to show, or tending to show, that the latter part of the al-
leged mistake ever in fact happened, that is, that the inter-
est, if any was bargained for, was to be paid annually. The

judgment of the circuit court is, that the contract be so re-formed as to read "with interest." Mr. Babcock, who drew the papers, testifies positively that he has no recollection that the parties ever said one word to him or in his presence upon the subject of interest, either by way of stating their agreement or directing him to include it in the contract which he was to prepare; and that independently of the papers, he has no remembrance of its terms. Still, he says that from an examination of the papers and the singularity of the fact that a mortgage to run so long should be without interest, his impression is that the words "with interest" were omitted by mistake. Again he says, after alluding to the same circumstances, "I have no doubt that the words 'with interest' were left out of the contract through a mistake." This is the substance of his testimony; and what is it, after all, but a mere surmise or strong suspicion of fact arising in his own mind after an imperfect survey of a transaction which happened many years before, and of which every positive idea had long since passed from his memory? Clearly, nothing. If he cannot say there was a mistake, I certainly cannot see how this court can, upon his evidence.

The other evidence in support of the respondent's claim consists in the alleged admissions of Edgar Meacham, deceased. Aside from the caution with which such testimony is to be received, on account of the ease with which it may be fabricated, and the difficulty with which it is to be met and disproved, I may say that the nature of the admissions here given, the circumstances under which they are said to have been made, and the character and relation of the witnesses by whom they are sought to be proved, are such as, in my judgment, make it very unsafe for us, upon them alone, to set aside or vary the contract as it now stands. I need not give the particular reasons for our conclusions upon this branch of the case. They will be readily perceived by a perusal of the testimony.

The judgment of the circuit court is reversed, and the case remanded for further proceedings in accordance with this opinion.

·PAINE, J. I agree with the majority of the court as to the law applicable to this case, but differ from them as to the effect of the evidence, which fully satisfies me that it was the intention of the parties to provide for interest, and that this was omitted in the note by mistake.